1
2
3
4
5
6
7

**United States District Court**
For the Northern District of California

8
9
10

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

11   JESSICA LLAMAS,                          No. 04-1369 MMC

12            Plaintiff,                       **ORDER GRANTING IN PART**
                                              **PLAINTIFF'S MOTION FOR SUMMARY**
13     v.                                      **JUDGMENT; DENYING DEFENDANT'S**
                                              **CROSS-MOTION FOR SUMMARY**
14   JO ANNE B. BARNHART, Commissioner of      **JUDGMENT**
     Social Security,
15                                             (Docket Nos. 10 and 11)
              Defendant
16   _____/

17

18          Plaintiff Jessica Llamas ("Llamas") brings this action pursuant to 42 U.S.C. § 1383(c)

19   to obtain judicial review of a final decision of the Commissioner of the Social Security

20   Administration ("Commissioner") denying her claim for Supplemental Security Income ("SSI")

21   under Title XVI of the Social Security Act.  Before the Court are Llamas's motion for summary

22   judgment and the Commissioner's cross-motion for summary judgment.  Llamas has not filed

23   a reply.  Pursuant to Civil Local Rule 16-5, the motions have been submitted on the papers

24   without oral argument.  Having considered the papers filed in support of and in opposition to

25   the motions, the Court rules as follows.

26                                   **BACKGROUND**

27          Llamas was born on December 1, 1982.  (See Certified Transcript of Administrative

28   Proceedings ("Tr.") at 129.)  She has an eleventh grade education, and was home-schooled

from eighth through eleventh grade.  (See Tr. at 576.)  When in school, Llamas attended

special education classes at least some of the time because of learning disabilities.  (See Tr.

at 143, 159, 172, 179.)  She was often absent from school as a result of various chronic

ailments that caused weakness, fatigue, pain and swollen hands.  (See Tr. at 133, 153, 162,

169, 176, 211.)

Llamas applied for SSI when she was fifteen and received SSI payments beginning in

October 1998, based on a disability identified as "borderline intellectual functioning."  (See Tr.

at 21, 54, 130-33.)  In early 2001, the Social Security Administration ("SSA") commenced a

review of Llamas's eligibility for such benefits pursuant to 42 U.S.C. § 1382c(a)(3)(H)(iii),

which requires the Commissioner to reconsider whether a recipient of childhood benefits is

eligible for benefits under the standards for adult disability after his or her eighteenth birthday.

(See Tr. at 61.)  The disability redetermination focused on diagnoses of affective mood

disorder and muscle, ligament and fascia disorders.  (See Tr. at 56.)  On May 31, 2001, the

SSA notified Llamas it had determined she was not disabled under the definition of disability

for adults, as of May 1, 2001, and therefore no longer qualified for SSI. (See Tr. at 61-62.)

Llamas requested reconsideration of the SSA's determination that she was not

disabled.  (See Tr. at 65-74.)  She described her disabling condition as:  "lupus, connective

tissue disease, fibromyalgia, TMJ (temporomandibular joint dysfunction syndrome), scoliosis,

severe pain, weakness, fatigue, headaches, nausea, chest pain, swelling and pain in hands

and arms, kidney problems, pain in walking, standing, sitting, severe back pain, blurred vision,

sensitivity to light, rash and hives, breathing difficulties."  (See Tr. at 67.)  On January 9, 2002,

a disability hearing officer heard Llamas's appeal.  (See Tr. at 76-88.)  After hearing

testimony from Llamas and her mother and reviewing the medical evidence in Llamas's file,

the hearing officer affirmed the determination that Llamas was not disabled.  (See Tr. at 89-

98.)

On January 18, 2002, Llamas requested a hearing before an Administrative Law

Judge ("ALJ").  (See Tr. at 60.)  An ALJ conducted a hearing on December 12, 2002, and

held a supplemental hearing on March 28, 2003.  (See Tr. at 21, 525-615.)  At the first

1   hearing, the ALJ heard testimony from Llamas and Llamas's mother, from James Derbin,

2   M.D., a medical expert specializing in psychiatry ("Dr. Derbin"), from Dr. Glenn Malley, a

3   medical expert specializing in internal medicine ("Dr. Malley"), and from a vocational expert

4   ("VE").  (See Tr. at 21, 525-67.)  The ALJ scheduled the supplemental hearing to allow time to

5   obtain additional medical records from physicians who treated Llamas after she turned

6   eighteen.  (See Tr. at 536-548.)  At the supplemental hearing, the ALJ heard further testimony

7   from Llamas, her mother, Dr. Malley and the VE.  (See Tr. at 570-615.)  Llamas appeared at

8   both hearings without counsel.  (See Tr. at 532-35, 510-615.)

9        On July 24, 2003, the ALJ issued a written decision affirming the termination of

10  Llamas's SSI benefits.  (See Tr. at 18-32.)  The ALJ found Llamas not disabled, based on the

11  five-step sequential evaluation process set forth in the Code of Federal Regulations.[1]  (See

12  Tr. at 22-27; 20 C.F.R. § 416.920.)  At step one, the ALJ concluded that Llamas did not

13  engage in substantial gainful activity from her alleged onset date until she began performing

14  substantial gainful activity on April 9, 2002.[2]  (See Tr. at 23.)  At step two, the ALJ determined

15  that "the medical evidence indicated Llamas had a learning disorder by history, borderline

16  intellectual functioning, and an adjustment disorder in current remission," and found those

17  impairments to be "severe" impairments within the meaning of 20 C.F.R. § 416.921.  (See Tr.

18  at 23.)  The ALJ also concluded that none of Llamas's other alleged impairments – lupus,

19  _____

20      [1] "The Commissioner follows a five-step sequential evaluation process in assessing whether a claimant is disabled.

21      Step one: Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.

22      Step two: Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate.

23      Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.

24      Step four: Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.

25      Step five: Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled."

26  McCartey v. Massanari, 298 F.3d 1072, 1074 n.6 (9th Cir. 2002) (citing 20 C.F.R.

27  § 404.1520, which is equivalent to 20 C.F.R. § 416.920).

28      [2] On April 9, 2002, Llamas began working as a pet groomer.  (See Tr. at 526, 549-552.)  Llamas left that job in April 2003, for reasons related to her health.  (See Tr. at 224.)

fibromyalgia, chronic fatigue syndrome, scoliosis, headaches, and jaw pain – taken singly or in combination, constituted a "severe" impairment within the meaning of the Regulations. (See Tr. at 25.)  The ALJ noted that he based this conclusion on the medical evidence, the testimony of the medical experts, and the light and medium levels of exertion required by the pet grooming job Llamas started in April 2002.  (See id.)

At step three, the ALJ concluded that Llamas's impairments, taken either singly or in combination, did not meet or equal an impairment listed in 20 C.F.R., Part 404, Subpart P, Appendix 1.  (See Tr. at 23.)  Alternatively, the ALJ concluded that Llamas had not produced sufficient evidence "of an impairment or combination of impairments of disabling or Listing level severity which has lasted or could be expected to last for the required duration of at least twelve months."  (See Tr. at 23.)

The ALJ proceeded to step four and concluded that, since the time of Llamas's "cessation from disability" on May 1, 2001, Llamas has had "no significant physical exertional functional limitations and [ ] is exertionally capable of performing a full range of work at all exertional levels."  (See Tr. at 25.)  The ALJ also found that Llamas does have non-exertional, mental limitations which limit her "to the performance of unskilled simple repetitive work due to her learning disorder combined with her borderline intellectual functioning, as well as her history of depressive adjustment disorder."  (See Tr. at 25.)

Because Llamas had no past relevant work, the ALJ proceeded to step five.  (See Tr. at 26.)  The ALJ noted that Medical-Vocational Rule 203.25 supported a finding of "not disabled," in light of Llamas's age, education, and work experience, coupled with the ALJ's finding that Llamas could perform substantially all of the requirements of medium work. (See Tr. at 26-27.) The ALJ further determined, based on Rule 203.25 of the Medical-Vocational Guidelines, that a significant number of jobs existed in the national economy that Llamas was able to perform.  See id.

On October 24, 2003, Llamas filed a request for review with the Social Security

1   Administration Appeals Council.[3]  (See Tr. at 17.)  On December 12, 2003, the Appeals

2   Council denied Llamas's request for review.  (See Tr. at 7, 11.)  Llamas then filed the present

3   action for judicial review pursuant to 42 U.S.C. § 1383(c).

4                                          **LEGAL STANDARD**

5           The Commissioner's determination to deny disability benefits will not be disturbed if it

6   is supported by substantial evidence and based on the application of correct legal standards.

7   See Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001).  Substantial evidence has been

8   defined as "more than a mere scintilla, but less than a preponderance; it is such relevant

9   evidence as a reasonable mind might accept as adequate to support a conclusion."  See De

10  la Fuente v. F.D.I.C., 332 F.3d 1208, 1220 (9th Cir. 2003) (internal quotation and citation

11  omitted).  The reviewing court must consider the administrative record as a whole and weigh

12  the evidence both supporting and detracting from the ALJ's decision.  See Reddick v. Chater,

13  157 F.3d 715, 720 (9th Cir. 1998).  If the evidence is susceptible to more than one rational

14  interpretation, the reviewing court will uphold the decision of the ALJ.  See Thomas v.

15  Barnhart, 278 F.3d 947, 954 (9th Cir. 2002).

16                                          **DISCUSSION**

17          In Llamas's motion for summary judgment, she argues that the ALJ's decision should

18  be reversed and benefits awarded.  Alternatively, Llamas seeks reversal and remand for

19  additional administrative proceedings to fully develop the evidence.  Llamas asserts the ALJ's

20  decision must be reversed because the ALJ erred at step three by failing to recognize – or by

21  failing to sufficiently develop the record in connection with – evidence that Llamas meets

22  Listing 12.05(C).  (See Tr. at 23; 20 C.F.R., Part 404, Subpart P, App. 1 § 12.05.)

23          In the Commissioner's cross-motion for summary judgment, the Commissioner argues

24  that Llamas has failed to prove a disability under Listing 12.05(C) because Llamas is not

25  "mentally retarded."  The Commissioner further maintains that the ALJ fulfilled his duty to fully

26  develop the record.

27  _____

28          [3] Llamas's request for review was untimely, but the Appeals Council found she had
    established good cause for the delay and allowed the request.  (See Tr. at 11.)

5

**A. Listing 12.05(C)**

Llamas contends the ALJ erred at step three by concluding that Llamas's impairments did not meet or equal any listed impairment.  Llamas argues that the ALJ should have determined she met the requirements for Listing 12.05(C) and erred by concluding otherwise. The ALJ made no mention of Listing 12.05(C) in his decision.

If a claimant's impairment meets or equals an impairment listed in 20 C.F.R., Part 404, Subpart P, Appendix 1, the claimant will be found disabled.  See 20 C.F.R. § 416.920(d).  The listings define impairments that prevent an adult from performing "any gainful activity," not just "substantial gainful activity."  See Sullivan v. Zabely, 493 U.S. 521, 532 (1990) (citing 20 C.F.R. § 416.925(a); see also SSR 83-19 at 90.  The burden of proof is on the claimant to establish that her impairment meets or equals a listing.  See id. at 530-31.  An ALJ's conclusion that a claimant's impairments do not meet or equal a listed impairment must be based on an evaluation of the relevant evidence.  See Lewis v. Apfel, 236 F.3d 503, 512 (9th Cir. 2001).  "A boilerplate finding is insufficient to support a conclusion that a claimant's impairment does not" meet or equal a listed impairment.  See id. (citing Marcia v. Sullivan, 900 F.2d 172, 176 (9th Cir. 1990)).

Listing 12.05 consists of an introductory paragraph, which sets forth the diagnostic description for mental retardation, and four alternative methods of showing the requisite level of severity.  See 20 C.F.R., Part 404, Subpart P, App. 1 §§ 12.00, 12.05.  In order to meet Listing 12.05, a claimant's impairment must satisfy the description contained in the introductory paragraph and any one of the four sets of criteria related to severity.  See id. § 12.00.  ("If your impairment satisfies the diagnostic description in the introductory paragraph and any one or more of the four sets of criteria, we will find that your impairment meets the listing.")  The introductory paragraph requires evidence of "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested . . . before age 22."  See id. § 12.05.

Listing 12.05(C), on which Llamas relies, sets forth one of the four means of showing the requisite level of severity.  In order to meet Listing 12.05(C), a claimant must show "[a]

6

1  valid verbal, performance, or full scale IQ of 60 through 70 <u>and</u> a physical or other mental

2  impairment imposing an additional and significant work-related limitation of function." <u>See</u> <u>id.</u>

3  § 12.05(C) (emphasis added). "[A]n impairment imposes a significant work-related limitation

4  of function when its effect on a claimant's ability to perform basic work activities is more than

5  slight or minimal." <u>Fanning v. Bowen</u>, 827 F.2d 631, 633 (9th Cir. 1987). "[A] finding of

6  severity is not required to satisfy the more than slight or minimal effect standard." <u>Id.</u> at 633

7  n.3 (citing <u>Edwards by Edwards</u>, 755 F.2d 1513, 1515 (11th Cir. 1985)).

8          Llamas contends her full-scale IQ, measured at 70, combined with her other physical or

9  mental impairments satisfies listing 12.05(C). The Commissioner maintains Llamas has not

10  satisfied listing 12.05(C) because evidence in the record refers to her mental impairment as

11  "borderline intellectual functioning" and no medical practitioner has described her as "mentally

12  retarded,"[4] and because Llamas did not produce evidence sufficient to show she has a

13  physical or other mental impairment that imposes an additional and significant work-related

14  functional limitation.

15          **1. Introductory Paragraph of Listing 12.05**

16          Although neither party addresses the issue in its motion for summary judgment, a

17  threshold inquiry with respect to Listing 12.05(C) is whether Llamas has demonstrated

18  "significantly subaverage general intellectual functioning with deficits in adaptive functioning

19  initially manifested . . . before age 22." <u>See</u> 20 C.F.R., Part 404, Subpart P, App. 1 § 12.05.

20          **a. Significantly Subaverage General Intellectual Functioning**

21          There is undisputed evidence in the record that supports a finding that Llamas has

22  demonstrated "significantly subaverage general intellectual functioning." According to her

23  mother, Llamas was placed in special education classes in elementary school. (<u>See</u> Tr. at

24  352, 366.) School records indicate she was diagnosed with a "specific learning disability."

25  (<u>See</u> Tr. at 208.) At age 16, Llamas obtained a full scale IQ of 55 on a test administered by a

26  _____

27          [4] "Borderline intellectual functioning is a condition defined as an IQ score within the 71-84 range, while mental retardation is a score of about 70 or below." <u>Roberts v. Apfel</u>, 222

28  F.3d 466, 470 n.3 (8th Cir. 2000) (citing American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> (4th ed. 1994)).

1 | psychologist, Paul Martin, Ph.D. ("Dr. Martin"), at the request of the California Department of

2 | Social Services.  (See Tr. at 352, 356.)  At age 18, she obtained a full scale IQ of 70 on a test

3 | administered by Wendy McCray, Ph.D. ("Dr. McCray"), a consulting psychologist who

4 | examined Llamas on May 4, 2001, at the request of the California Department of Social

5 | Services.  (See Tr. at 366, 368.)

6 | **b.  Deficits in Adaptive Functioning**

7 | The record contains evidence to support a finding that Llamas does not demonstrate

8 | deficits in adaptive functioning.  "Adaptive functioning" refers to "'the person's effectiveness in

9 | areas such as social skills, communication, and daily living skills, and how well the person

10 | meets the standards of personal independence and social responsibility expected of his or

11 | her age by his or her cultural group.'"  See Atkins v. Virginia, 536 U.S. 304, 308 n.3 (2002)

12 | (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental

13 | Disorders 28-29 (3d rev. ed. 1987)).

14 | Llamas reported having friends and participating in normal daily activities such as

15 | shopping, driving, caring for her pets, routine grooming and hygiene, and light housework.

16 | (See Tr. at 90, 366-67.)  Llamas's school records indicate she exhibited good behavior (see

17 | Tr. at 138, 173); she was able to finish projects, listen, remain attentive, and think before

18 | acting (see Tr. at 168, 175); and she had no problems with speech or expression of her

19 | thoughts and feelings (see Tr. at 169-71, 176-78).  The report cards contained in the record

20 | generally reflect average or above average performance.  (See Tr. at 138, 215-16.)  Dr.

21 | McCray concluded that Llamas's ability to interact appropriately with others and to understand

22 | and follow directions was unimpaired.  (See Tr. at 24, 369.)  The record also contains,

23 | however, Dr. Derbin's opinion that Llamas exhibits deficits in adaptive functioning. (See Tr. at

24 | 435.)  Dr. Derbin's opinion is contained in a "Psychiatric Review Technique" form completed

25 | at the request of the ALJ, in which Dr. Derbin concludes Llamas's mental disorder caused

26 | mild functional limitations with respect to daily living, social functioning, and maintaining

27 | concentration, persistence or pace.  (See id.)  Although the opinion of a non-examining

28 | physician, such as Dr. Derbin, is entitled to less weight than that of a doctor who has treated or

8

examined the claimant, see Lester v. Chater, 81 F.3d 821, 830 (9th Cir.1995), the ALJ here did not indicate any disagreement with Dr. Derbin's findings.  (See Tr. at 25.)

Accordingly, the record contains sufficient evidence to support a finding that Llamas meets both requirements of the introductory paragraph of listing 12.05.

**2. Severity**

The inquiry under Listing 12.05 is not complete, however, until the requisite showing of severity is made.  A mental impairment is sufficiently severe to meet Listing 12.05 if the two prongs of that listing are met.  (See 20 C.F.R., Part 404, Subpart P, App. 1 § 12.05(C).)  The first prong may be satisfied with a full scale IQ of 60 through 70.  (See id.)  The second prong may be satisfied where an additional "physical or other mental impairment imposes an additional and significant work-related functional limitation" is shown.  (See id.)

**a.  IQ Score**

According to Dr. McCray's testing, Llamas's full scale IQ measured 70.  (See Tr. at 368.)  While Dr. McCray described this result as falling within "the borderline range" rather than demonstrating mental retardation, see id., the score nonetheless meets the first prong of Listing 12.05(C), which, as noted, may be satisfied with a full scale IQ of 60 through 70,  see 20 C.F.R. Part 404, Subpart P, App. 1 § 12.05(C).

**b.  Additional Mental or Physical Impairment**

To satisfy the second prong of Listing 12.05(C), Llamas must show she suffers from a physical or other mental impairment that imposes an additional and significant work-related functional limitation.  See id.  As noted, such limitation is considered "significant" if it imposes more than a slight or minimal effect on a claimant's ability to perform basic work activities.  See Fanning, 827 F.2d at 633.  Llamas argues the ALJ erred by failing to conclude that Llamas met the second prong of Listing 12.05(C).

**1.  Mental Impairments**

Llamas contends the ALJ's finding at step two, that Llamas had an "adjustment disorder in current remission," constitutes evidence of an additional mental impairment sufficient to satisfy the second prong of Listing 12.05(C).  (See Tr. at 23.)  As noted, the ALJ

9

did not specifically refer to Listing 12.05 in finding Llamas failed to meet one of the listed impairments.  Although a "boilerplate finding" is not sufficient to support such a conclusion, see Lewis v. Apfel, 236 F.3d 503, 512 (9th Cir. 2001), there is no requirement that the ALJ discuss the evidence under the heading "Findings," see id. at 513.  Here, the ALJ found Llamas's adjustment disorder to be "in current remission."  (See Tr. at 23.)  In reaching his conclusion, the ALJ relied in part on the opinion of Dr. McCray, the psychologist who had examined Llamas most recently, and who "rule[d] out" an "adjustment disorder."  (See Tr. at 23, 368.)   Moreover, and of equal if not greater significance, there is no evidence in the record showing Llamas's adjustment disorder imposes any limitation on her ability to work or that satisfies the twelve-month duration requirement.  In particular, the record contains no evidence that Llamas's adjustment disorder had any impact on her ability to perform basic work activities during the time period relevant to this matter, specifically, from May 1, 2001, when Llamas's benefits were terminated, until April 9, 2002, when she began working as a dog groomer.

As discussed above, to meet the second prong of Listing 12.05(C), Llamas must show not only that she suffers from an "other mental impairment," i.e., an impairment other than mental retardation, she also must show that such other mental impairment "impos[es] an additional and significant[5] work-related limitation of function."  See 20 C.F.R., Part 404, Subpart P, App. 1 § 12.05(C ) (emphasis added).  Here, even if the record could support a finding that Llamas suffers from an adjustment disorder, there is no evidence that any such disorder imposed any additional limitation beyond that attributable to Llamas's mental retardation.

Accordingly, to the extent, Llamas relies on an adjustment disorder to meet the "other mental impairment" requirement of Listing 12.05(C), the ALJ did not err in finding Llamas's impairments failed to meet or equal a listed impairment.

---

[5] As noted, a "significant" limitation of function is one whose effect on a claimant's ability to perform basic work activities is "more than slight or minimal."  See Fanning v. Bowen, 827 F.2d at 633.

## 2.  Physical Impairments

Llamas argues that even if her mental impairments are not sufficient to satisfy the second prong of Listing 12.05(C), she has physical impairments that satisfy the second prong. In particular, Llamas contends the ALJ ignored the opinion of Joan Bradus, M.D. ("Dr. Bradus"), a non-examining medical consultant,[6] in which Dr. Bradus opined that "an RFC for light [work] is prudent on physical grounds," (see Tr. at 380), and that the ALJ implicitly recognized Llamas's physical limitations at step five when he relied on the Medical-Vocational Guidelines for a claimant restricted to medium work, (see Tr. at 26-27).        At the hearings, the ALJ focused on Llamas's physical impairments.  With assistance from Dr. Malley, the ALJ explored evidence of Llamas's symptoms of lupus, medical treatment she may have obtained in connection with symptoms she attributed to lupus, and the efficacy of medication she took to control those symptoms.[7]  (See Tr. at 559-60, 562, 581-94.)  The ALJ asked Dr. Malley whether there was evidence in the record pertaining to fibromyalgia, scoliosis, migraine headaches, a temporomandibular joint problem, and connective tissue inflammation, and Dr Malley noted there were no objective diagnoses of these impairments in the record.  (See Tr. at 599-607.)

The record also contains the report of Suzanne M. Stone, M.D. ("Dr. Stone"), an internist who examined Llamas on May 10, 2001 at the request of the SSA.  (See Tr. at 371-73.)  Dr. Stone stated that her physical examination of Llamas was normal and that she found "no impairment related physical limitations [and] [n]o exertional limitations." (See Tr. at 373.) As Llamas points out, however, Dr. Bradus concluded Llamas's residual functional capacity was for no more than light work based on "physical grounds," (see Tr. at 380), and that the ALJ "ignored" that evidence in his decision, (see Pl.'s Mot. at 7).

Where an ALJ does not give controlling weight to the opinion of a treating practitioner,

---

[6] Dr. Bradus examined Llamas's medical records at the request of the SSA and submitted a report dated November 6, 2001.  (See Tr. at 379–81.)

[7] Dr. Malley noted that the medical evidence contains "features consistent with . . . some disorder of the immune system," but that a diagnosis of lupus was never objectively verified.  (See Tr. at 594, 597-99.)

1    the ALJ "must explain in the decision the weight given to the opinions" of other health care

2    providers, and, in particular, state agency medical and psychological consultants.  See 20

3    C.F.R. § 416.927(f)(2)(ii); see also SSR 96-6p (providing ALJ "may not ignore" opinions of

4    state agency physicians and  "must explain the weight given to these opinion in their

5    decisions"). As discussed, a "significant" limitation of function for purposes of Listing 12.05 is

6    simply a limitation that has "more than a slight or minimal" effect on a claimant's ability to work,

7    see Fanning v. Bowen, 827 F.2d at 633, and "a finding of severity is not required to satisfy the

8    more than slight or minimal effect standard."  See id. n.3.  Consequently, the second prong will

9    be satisfied where a claimant is limited to light or sedentary work.  See Mowery v. Heckler,

10   771 F.2d 966, 973 (6th Cir. 1985).  Here, as noted, Dr. Bradus, a state agency physician,

11   provided her opinion that Llamas is restricted to sedentary work by reason of her physical

12   symptoms, and, as further noted, the ALJ made no reference to Dr. Bradus's opinion in his

13   decision.

14         The Court notes that Dr. Bradus also identified credibility issues, stating that

15   "[a]llegations/[symptoms] are not in proportion to findings," (see Tr. at 380), and that a

16   non-examining physician's opinion is entitled to less weight than that of a treating or examining

17   physician, see Lester v. Chater, 81 F.3d at 830.  The fact that the ALJ could have chosen to

18   rely on the assessment of Dr. Stone, who examined Llamas and determined Llamas had no

19   physical limitations, over the assessment of Dr. Bradus, who never examined Llamas, does

20   not alter the fact that the ALJ's decision is devoid of any discussion to that effect.  This

21   omission, particularly when coupled with the absence of any express findings as to Listing

22   12.05(C), constitutes error.

23         Accordingly, to the extent Llamas relies on a "physical impairment" to meet the

24   requirements of Listing 12.05(C), the ALJ erred in failing to adequately explain his reasons for

25   finding Llamas's impairments do not meet or equal a listed impairment.

26   **B.  ALJ's Duty to Develop the Record**

27         Llamas argues that to the extent the ALJ did not find Llamas to have any significant

28   physical impairment, his conclusion was hampered by an incomplete record.  The

12

1  Commissioner maintains that the ALJ thoroughly explored the issues presented by Llamas's

2  claim by conducting two hearings at which he took testimony from a psychological expert

3  witness, a medical expert witness, and a vocational expert, and in preparation for which the

4  SSA ordered both psychological and medical examinations of Llamas.

5       "In Social Security cases the ALJ has a special duty to fully and fairly develop the

6  record and to assure that the claimant's interests are considered."  Brown v. Heckler, 713

7  F.2d 441,43 (9th Cir. 1983) (citing Thompson v. Schweiker, 665 F.2d 936, 941 (9th Cir.

8  1982)).  When the claimant is unrepresented, the ALJ must be particularly diligent in exploring

9  all the relevant facts.  See Cox v. Califano, 587 F.2d 988, 991 (9th Cir. 1978).  "Ambiguous

10 evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation

11 of the evidence, triggers the ALJ's duty to 'conduct an appropriate inquiry.'"  Tonapetyan v.

12 Halter, 242 F.3d 1144, 1150 (9th Cir. 2001) (citing Smolen v. Chater, 80 F.3d 1273, 1288 (9th

13 Cir. 1996)).  Among the means by which an ALJ may fulfill this duty are subpoenaing or

14 submitting questions to the claimant's physicians, continuing the hearing, or keeping the

15 record open after the hearing to allow for supplementation of the record.  See Tonapetyan,

16 242 F.3d at 1150.

17      Here, the ALJ recognized, at the first hearing, that the record was incomplete with

18 respect to evidence of medical treatment Llamas may have received during the relevant time

19 period between her eighteenth birthday and the commencement of her pet grooming job in

20 April 2002.  (See Tr. at 536-48.)  He continued the hearing to allow time for the collection of

21 medical records from additional treating sources[8] and advised Llamas that he also would

22 accept a letter from a treating doctor, or any doctor affiliated with a treating doctor, describing

23 Llamas's situation.  (See Tr. at 563-64.)  Llamas subsequently provided more precise

24 information about other medical sources and the ALJ obtained additional evidence, which he

25 described at the second hearing.  (See Tr. at 436-487, 571-574.)  The ALJ also agreed to

26 _____

27      [8] The ALJ necessarily relied on Llamas to provide the names and addresses of
   treating sources from whom records had not yet been obtained, and the record shows that the
28 ALJ clearly explained to Llamas the type of information he needed to obtain such records.
   (See Tr. at 538-48.)

1    delay his decision for a week after the conclusion of the second hearing to afford Llamas an

2    opportunity to write him a letter containing additional statements or arguments and to point out

3    any evidence in the record regarding medical diagnoses of Llamas's physical impairments.[9]

4    (See Tr. at 613-14.)

5          Llamas identifies no medical records that were not before the ALJ and that would

6    support a finding she is disabled.  Although Llamas contends that records from a certain

7    specialty clinic, which the ALJ obtained after the first hearing, appear to be incomplete,

8    Llamas provides no evidence that additional records from the clinic do in fact exist.

9          The record shows the ALJ was diligent in his efforts to develop the record.

10   Accordingly, the ALJ fulfilled his duty to develop the record with respect to Llamas's

11   impairments.

12   **C. Remand**

13         The Court has found that the ALJ failed to adequately explain his reasons for finding

14   plaintiff does not have an impairment that meets or equals a listed impairment.

15         Where the ALJ has improperly rejected relevant evidence, some courts have declined

16   to "remand solely to allow the ALJ to make specific findings" regarding that evidence; rather,

17   such courts have credited the improperly rejected evidence as true and remanded solely for

18   an award of benefits.  See Lester, 81 F.3d at 834 (internal quotation and citation omitted); see

19   also Smolen, 80 F.3d at 1292 (holding court may remand for award of benefits "where the

20   record has been fully developed and where further administrative proceedings would serve no

21   useful purpose").  Other courts, however, have not found the "crediting as true" doctrine to be

22   mandatory.  See Connett v. Barnhart, 340 F.3d 871, 876 (9th Cir. 2003) (discussing cases;

23   remanding for reconsideration of claimant's pain testimony); see also Bunnell v. Barnhart, 336

24   F.3d 1112, 1115-16 (9th Cir. 2003) (remanding for reconsideration where, inter alia, ALJ

25   "failed to provide adequate reasons for rejecting the opinion of the treating physicians" and

26   "did not properly reject [the claimant's] subjective complaints").  In the latter instance, courts

27

28           [9] The ALJ asked Llamas's mother how much time she would need to review the record
       and write a letter; she indicated one week was sufficient.  (See Tr. at 613-14.)

1   have remanded where "outstanding issues must be resolved before a proper determination

2   can be made." See id. at 1115.

3       In the instant case, there are outstanding issues that must be resolved before a proper

4   determination can be made.  As noted, the ALJ found Llamas does not have "an impairment

5   that meets or equals a listed impairment," (see Tr. at 27), but failed to provide a sufficient

6   explanation for this finding.  In particular, the ALJ did not sufficiently explain why Llamas did not

7   meet the requirements of Listing 12.05(C).

8       Under these circumstances, the Court does not find that "the record has been fully

9   developed" or that "further administrative proceedings would serve no useful purpose." See

10  Smolen, 80 F.3d at 1292; see e.g., Bunnell, 336 F.3d at 115-16 (remanding for further

11  proceedings where ALJ failed to provide adequate reasons for rejecting treating physician's

12  opinion and claimant's subjective complaints); Dodrill v. Shalala, 12 F.3d 915, 917-18 (9th Cir.

13  1993) (remanding for ALJ to identify specific facts in record demonstrating claimant in less

14  pain than alleged).  Consequently the Court will remand the action for further administrative

15  proceedings to afford the ALJ the opportunity to more fully set forth the basis for his

16  conclusions.

17                            **CONCLUSION**

18      For the reasons stated above, plaintiff's motion for summary judgment is hereby

19  GRANTED in part, and defendant's cross-motion for summary judgment is DENIED.  The

20  matter is REMANDED for further proceedings consistent with this decision.

21      The Clerk shall close the file.

22      **IT IS SO ORDERED.**

23  Dated: June 1, 2005                    /s/ Maxine M. Chesney
                                           MAXINE M. CHESNEY
24                                         United States District Judge

25

26

27

28

                                    15